**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

KATHERINE HARRIS,            )
    Plaintiff,            )
               )
    v.            )          CAUSE NO.: 2:06-CV-222
               )
MICHAEL J. ASTRUE,            )
Commissioner of the Social Security            )
Administration,            )
    Defendant.            )

**OPINION AND ORDER**

This matter is before the Court on a Complaint [DE 1], filed by the Plaintiff, Katherine

Harris, on June 21, 2006, and a Plaintiff's Opening Social Security Memorandum [DE 15], filed by

the Plaintiff on January 24, 2007.  The Plaintiff seeks judicial review of a final decision of the

Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), in which

she was denied Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

under §§ 216(i), 223, and 1614 of the Social Security Act, 42 U.S.C. §§ 416(i), 412, 1381(a) and

1382(a).  For the following reasons, the Court grants the Plaintiff's request to remand the decision

of the Commissioner.

**PROCEDURAL BACKGROUND**

The Plaintiff filed applications with the Social Security Administration for DIB and SSI on

August 18, 2003, alleging disability due to depression, anxiety, and asthma, and an onset date of

January 7, 2003.  The applications were denied initially on October 7, 2003, and again upon

reconsideration on February 26, 2004.  On March 12, 2004, the Plaintiff filed a timely request for

hearing.  A hearing was held on May 17, 2005, in Gary, Indiana, before Administrative Law Judge

Paul Armstrong ("the ALJ"). Vocational Expert Glee Ann Kehr ("the VE") testified at the hearing. Attorney James Balanoff represented the Plaintiff at the hearing.

On August 29, 2005, the ALJ issued a decision denying benefits. On October 5, 2005, the Plaintiff filed a timely request for review with the Social Security Appeals Council. On February 10, 2006, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Pursuant to social security procedure, the Plaintiff had until April 16, 2006, to file a complaint for review of the Commissioner's decision. The Appeals Council granted the Plaintiff an extension of time allowing her until June 22, 2006, to file a civil action. On June 21, 2006, the Plaintiff filed her Complaint with this Court. On January 24, 2007, the Plaintiff filed her opening memorandum. The Commissioner filed his response on April 25, 2007, and the Plaintiff filed her reply on the same day.

On September 6, 2006, the parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A. Background

The Plaintiff, born on May 20, 1965, was 37 years old on her alleged date of disability onset, and 39 years old at the time of the hearing. She is married, has four children, stands 5'6", and weighs 130 pounds. The Plaintiff reported that she finished eleven years of school and did not graduate from high school but did graduate from a professional career development institute where

she received a certificate of completion for child development education.  Her past relevant work includes work as a cashier, day care worker, and housekeeper.

### B.  Medical Evidence

In a St. Catherine Hospital Care Network treatment note dated May 7, 2002, it states that the Plaintiff has asthma but smokes and also suffers from hypertension.  On August 21, 2002, a physician prescribed Singulair, an asthma medication, to the Plaintiff.  On April 21, 2003, the Plaintiff reported to St. Catherine Hospital complaining of pain and numbness in her left wrist.  Physicians diagnosed the Plaintiff with a left wrist cyst and possible nerve impingement.

Randal D. Reynolds, Ph.D., conducted a psychological evaluation of the Plaintiff on April 11, 2003, at the referral of Mildred Perry, a Family Case Manager from the Lake County Office of the Division of Family and Children.  The evaluation was court ordered due to a report by the Plaintiff's teenage daughter that she had been raped by the Plaintiff's husband.  The Plaintiff reported that she lived with her husband of nearly nine years and together they had a two year old daughter.  The Plaintiff stated that she had a fifteen year old daughter and an eighteen year old son who apparently is mentally handicapped.  The Plaintiff reported that she also had a twenty year old son who was in jail.  The Plaintiff further reported that she was unemployed after being laid off from her job at a day care center.  The Plaintiff indicated that she had never undergone any type of psychological testing, outpatient therapy or psychiatric hospitalizations, or pharmacology treatment for mental illness.  The Plaintiff also indicated that she did not have any current health problems.

On evaluation, Dr. Reynolds reported that he observed no unusual motor or posture movements.  He noted the Plaintiff to be mild-mannered, soft-spoken, quiet, and cooperative.  The Plaintiff displayed good eye contact and seemed comfortable with the assessment process.  Dr.

Reynolds indicated that the Plaintiff did not present in a defensive manner and that she willingly participated in the assessment process.

Dr. Reynolds administered a Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III")[1] IQ test. The Plaintiff earned a verbal IQ score of 70, a performance IQ score of 77, and a full-scale IQ score of 71. Dr. Reynolds stated that the Plaintiff's full IQ score fell across the extremely low to borderline range of intellectual functioning.[2]

Dr. Reynolds noted that the Plaintiff displayed "a certain level of insecurity or self-doubt." R. at 208. The Plaintiff denied a history of suicidal thoughts or attempts or a history of depressive episodes but acknowledged certain depressive symptoms that would support an adjustment disorder classification. Dr. Reynolds opined that the testing "predicts a woman who has likely learned many of the required skills necessary for adult living, such as preparing food, cleaning her home, basic first-aid, and so on, through observation or trial and error learning." *Id*. Dr. Reynolds surmised, "[a]lthough she likely knows, for example, not to leave uncooked chicken at room temperature for too long, or not to use certain types of paint in an unventilated room, she would likely struggle to explain why." *Id*. Dr. Reynolds added that the Plaintiff reported "a possibility of employment in the near future at a daycare. If this does not work out, she may need some assistance in finding employment." R. at 209.

---

[1]The Wechsler Intelligence Scales are a series of standardized tests used to evaluate cognitive abilities and intellectual abilities in children and adults. *See* U.S. National Library of Medicine ("NLM"), National Institutes of Health ("NIH") MedlinePlus, IQ Testing (last visited on July 27, 2007) at http://www.nlm.nih.gov/medlineplus/ency/article/001912.htm.

[2]Although IQ scores alone do not diagnose mental retardation, scores in the range of 50-55 to approximately 70 fall within the classification. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders*, 40 (4th Ed. 1994) ("*DSM-IV*"). Borderline intellectual functioning describes an IQ that falls within the 71-84 range. *See DSM-IV* at 684.

On June 10, 2003, the Plaintiff attended a one hour individual therapy session with Shona N. Vas, Ph.D., at Southlake Center for Mental Health ("Southlake"). The Plaintiff reported that she felt depressed due to her family situation. At a June 26, 2003, session with Dr. Vas, the Plaintiff discussed her daughter and broke down into tears and said that there were days she wished she was dead and felt as if no one loved her. A Southlake report, dated June 24, 2003, indicated that the Plaintiff's Global Assessment of Functioning ("GAF") score was 55.[3]

Syed Saboor, M.D., a Southlake physician, conducted a psychiatric evaluation of the Plaintiff on August 7, 2003, at the referral of Dr. Vas. The Plaintiff complained of nervousness, anxiety attacks, and depression. The Plaintiff reported the events that led to her daughter being removed from her home and repeated the daughter's allegations of rape against the Plaintiff's husband. The Plaintiff stated that she suffered from lack of energy, low level of interest, disturbed sleep, and that she has very few friends and very few interests. The Plaintiff reported that she had never been treated for depression and had never taken any psychotropic medications. She stated that she was laid off from her job at a day care center due to downsizing.

On evaluation, Dr. Saboor found the Plaintiff to be cooperative, mild-mannered, soft-spoken, and quiet. The Plaintiff exhibited good eye contact and she was alert and oriented. The Plaintiff displayed an anxious and depressed affect and she stated that "I want to die but I cannot kill myself and I will not kill myself." R. at 246. The Plaintiff reportedly denied any further suicidal or homicidal ideations and denied any suicide attempts. Dr. Saboor saw no evidence of illusions, hallucinations, or delusions. Dr. Saboor reported that the Plaintiff had poor short-term memory,

---

[3]The GAF scale is used to report the clinician's judgment of an individual's overall level of functioning and is scored on a 100-point scale. A GAF scale of 51-60 indicates moderate symptoms such as flat affect or suggests moderate difficulty in social, occupational, or school functioning. *DSM-IV* at 34.

immediate recall, and past memory and her attention and concentration were poor.  Dr. Saboor opined that the Plaintiff's intellect appeared to be below average, her fund of general information was fair, insight was limited, and judgment was fair.  Dr. Saboor diagnosed the Plaintiff with dysthymia, early onset and depressive disorder, bronchial asthma, and arthritis and assigned her a GAF score of 31.[4]  Dr. Saboor identified numerous stressors in the Plaintiff's life, including her daughter's placement in foster care, the accusation of rape against her husband, her son's incarceration, and her unemployment.

In an August 25, 2003, conversation with Dr. Vas, it is noted that the Plaintiff stated that she was suicidal and had a plan to use her husband's gun.  However, Dr. Vas opined that the Plaintiff did not display an active intent to commit suicide.  The Plaintiff saw Dr. Vas again on August 27, 2003, and cried profusely throughout the session.

On September 29, 2003, Drs. Vas and Saboor jointly completed a report of psychiatric status. They reported that the Plaintiff had been diagnosed with dysthymia, a chronic mood disorder manifested as depression for most of the day on more days than not, and a depressive disorder not otherwise specified and they assigned her a GAF of 31.  *See* Stedman's Medical Dictionary 602 (28th ed. 2006).  They noted the current situation of the Plaintiff's life, including her unemployment and issues with the Department of Family and Children.  They noted that the Plaintiff had been looking for a job without success and described an onset of depressive symptoms in January 2003. They indicated that no abnormalities were observed with the Plaintiff's thought processes and they observed concrete thinking.  They found the Plaintiff to be in a depressed and anxious mood.  Based

---

[4]A GAF score in the range of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See DSM-IV* at 34.

on their evaluation, Drs. Vas and Saboor reported that the Plaintiff's depression had increased and that she displayed sadness, tearfulness, lack of motivation, fatigue, low energy, poor self esteem, worry, and hopelessness. They further opined that the Plaintiff had "limited intellectual functioning" R. at 257.

On September 30, 2003, K. Neville, Ph.D., a State Agency psychologist, reviewed the evidence of record and opined that the Plaintiff suffered from affective disorders. Dr. Neville opined that the Plaintiff had mild limitations in the functional areas of: restrictions of activities of daily living and difficulties in maintaining social functioning. Dr. Neville also opined that the Plaintiff had a moderate degree of limitation in the functional area of: difficulties in maintaining concentration, persistence, or pace.

On October 1, 2003, Dr. Saboor performed a mental status exam and diagnosed the Plaintiff with early onset dysthymia, depressive disorder not otherwise specified, bronchial asthma, and arthritis. On October 7, 2003, Dr. A. Landwehr, a reviewing State Agency doctor, completed a physical residual functional capacity assessment. Dr. Landwehr opined that the Plaintiff had no physical limitations other than a need to avoid extreme cold, fumes, odors, dusts, gases, and poor ventilation.

On November 5, 2003, the Plaintiff met with Dr. Vas and discussed the situation involving her daughter. The Plaintiff reported that she had been so anxious that she was unable to eat or sleep and had lost a lot of weight and threw up after every meal. On November 13, 2003, the Plaintiff saw Dr. Saboor who continued medication treatment of Celexa, Trazodone, and Clonazepam and prescribed Lexapro.

On December 9, 2003, the Plaintiff reported to Saint Margaret Mercy Healthcare Center complaining of bleeding. Physicians diagnosed the Plaintiff with dysfunctional uterine bleeding and anemia. The Plaintiff also complained of asthma, anxiety, and depression.

On December 11, 2003, and December 31, 2003, the Plaintiff saw Dr. Saboor. On both occasions, Dr. Saboor noted that the Plaintiff described her mood as low and her affect was consistent with her mood. Dr. Saboor also noted that the Plaintiff's insight was minimal and her judgment was fair. At a January 21, 2004, appointment with Dr. Vas, the Plaintiff appeared significantly depressed and was tearful during the session. The Plaintiff stated that she felt like she was alone and under a rock.

On January 30, 2004, W. Shipley, Ph.D., a State Agency psychologist, reviewed the evidence of record and noted that the Plaintiff had been diagnosed with dysthymia and depression and that treatment seemed to focus mainly on family issues involving the Plaintiff's daughter and husband. Dr. Shipley opined that the Plaintiff displayed deeply depressed symptoms but was not limited in her ability to: remember locations and work-like procedures; understand, remember, and carry-out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Dr. Shipley also opined that the Plaintiff was moderately limited in her ability to: understand, remember, and carry-out detailed instructions; maintain attention and concentration for

8

extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. Dr. Shipley further opined that the Plaintiff's cognitive functioning was intact; that she was able to socialize appropriately; and that she had the ability to carry out simple, repetitive tasks.

On February 26, 2004, Sheila C. Rao, D.O., instructed the Plaintiff to start taking Remeron for her depression along with the Klonopin and Trazodone she was already taking. On March 23, 2004, at Dr. Vas's suggestion, the Plaintiff attended group therapy for individuals with depression to focus on emotional processing. On March 25, 2004, the Plaintiff saw Dr. Rao for a follow-up visit to evaluate the effectiveness of the Remeron. The Plaintiff gained weight on Remeron and stated that she still felt depressed and very anxious. Dr. Rao increased the dosage.

On April 6, 2004, Dr. Rao completed a medical assessment of mental ability to do work-related activities. Dr. Rao diagnosed the Plaintiff with borderline intellectual functioning. Dr. Rao opined that the Plaintiff had fair ability to: follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; maintain attention/concentration; understand, remember, and carry out complex, detailed, and simple job instructions; behave in an emotionally stable manner; and relate predictably in social situations. Dr. Rao opined that the Plaintiff had poor to no ability to: deal with work stresses or function independently.

A Southlake progress note dated April 22, 2004, indicated that the Plaintiff wanted to quit therapy but reported feeling depressed and guilty because her daughter recently ran away. The Plaintiff was advised to continue to treat her problems and was noted to have limited insight and judgment and no suicidal ideations.

The Plaintiff continued her therapy at Southlake on May 4, 2004, and a treatment notation stated that the Plaintiff's condition had improved.  The Plaintiff continued a regular schedule of therapy, reporting to Southlake four times over the next two weeks.  On May 18, 2004, a physician assigned the Plaintiff  a GAF score of 45.[5]

On August 3, 2004, the Plaintiff started a partial hospitalization program at Southlake for her ongoing depression and anxiety.  In a progress note dated August 16, 2004, Dr. Rao noted that the Plaintiff's mood was depressed and affect was very constricted.  On September 14, 2004, Dr. Vas assigned the Plaintiff a GAF score of 48.  On September 30, 2004, in a Southlake program transfer note, the Plaintiff received a GAF score of 35.  In a November 16, 2004, treatment plan review, Natalie Hargrove, MA, opined that the Plaintiff made moderate improvement in the areas of depression and learning cognitive skills, minimal improvement in being able to identify relationship problems, and no change in her ability to live independently.

In a measure of the Plaintiff's kidney activity on January 4, 2005, her creatinine level was 1.9.  On January 7, 2005, in group therapy, the Plaintiff reported feeling anger, depression, sadness, and reported seeing a hallucination of a black image on top of her with red eyes.  In a January 5, 2005, treatment note, it states that the Plaintiff's insurance would not cover gout medication to treat the Plaintiff's swollen left leg and swollen feet.  A January 28, 2005, Southlake progress note states that the Plaintiff reported having suicidal thoughts over the past week and felt angry and depressed. The Plaintiff also reported having visual hallucinations.  The Plaintiff stated that she only felt pain when she urinated.

---

[5]A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional ritual, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job)."  *See DSM-IV* at 34.

On February 1, 2005, the Plaintiff reported for treatment complaining of pain in her left leg and both feet, asthma, and hypertension.  On February 15, 2005, a physician prescribed Seroquel and reduced the prescribed dosage of Trazodone.  A February 24, 2005, Southlake progress note states that the Plaintiff reported an ongoing hallucination of the devil trying to attack her but she did not display any psychotic symptoms while in the treatment program.  In a March 3, 2005, progress note, the Plaintiff reported that in reaction to family circumstances, she attempted to self mutilate and she was binging to cope with her feelings.  In a March 10, 2005, progress note, Natalie Hargrove, MA, notes that the Plaintiff presented with extreme and potentially delusional thoughts regarding her daughter and husband.

On March 27, 2005, the Methodist Hospitals admitted the Plaintiff due to abnormally low potassium ions in the blood, lethargy, nausea, vomiting, diarrhea, chronic obstructive pulmonary disease, acute renal failure, inflammation of the kidneys, a urinary tract infection, gastritis, reflux esophagitis, anemia, hernia, borderline enlargement of the heart, gallstones, nausea caused by sepsis, peritonitis,[6] and bi-polar disorder.  When admitted, the Plaintiff's creatinine levels were 11.7 and dropped to 3.4 by her April 5, 2005, release date.  The Plaintiff attended a follow-up visit on April 14, 2005, and a treatment notation states that she had edema, fatigue, pain, and swelling in her leg. The Plaintiff's creatinine level at the follow-up visit measured 2.20.

On April 27, 2005, the Methodist Hospitals admitted the Plaintiff for a second time.  The Plaintiff complained of severe chest pain, nausea, vomiting.  The Hospital reportedly admitted her because she "would not go away."  R. at 520.  A physician diagnosed the Plaintiff with pancreatitis

---

[6]"Peritonitis" is defined as "[i]nflammation of the peritoneum."  Stedman's Medical Dictionary 1465 (28th ed. 2006).  "Peritoneum" is defined as "[t]he serous sac, consisting of mesothelium and a thin external layer of irregular connective tissue, that lines the abdominopelvic cavity and covers most of the viscera contained therein." *Id*.

with chronic renal insufficiency due to kidney failure, severe costochondritis,[7] anemia, vomiting, diarrhea, and a urinary tract infection.  On April 29, 2005, the Hospital released the Plaintiff.  On May 24, 2005, the Plaintiff had a creatinine level of 1.6, noted as being high.  On June 14, 2005, the Plaintiff underwent an examination of the contents of her abdominopelvic cavity, performed by Godwin Uwindia, M.D.

## C.  Plaintiff's Testimony

At the hearing, the Plaintiff testified that her doctors told her that prescribed psychiatric medications Remeron and Seroquel caused her shortness of breath and "real bad pain."  R. at 36-37. The pain reportedly also resulted from pancreatitis and renal insufficiency.  The Plaintiff reported that her doctors took her off the psychiatric medications, which left her "really, really depressed." *Id*.  She testified that she continued to take psychiatric medications Trazodone and Klonopin.

The Plaintiff testified that she did not finish high school because she got involved with the wrong crowd and was negatively influenced.  The Plaintiff reported that  she lives with her youngest daughter and son, that she does not get along with her oldest daughter, and that her oldest son is disabled and only stays with her some of the time.  She testified that she cooks and takes care of her apartment the best she can, but her mother does the shopping and she otherwise receives help from her family.

The Plaintiff was not sure when she last worked.  She stated that she was fired from her most recent job because she "went off on the supervisor" and she was never rehired because she previously passed out on the job when she was unable to handle the stress.  R. at 41.  She testified that she worked as a cashier at Target during the Christmas season but Target would not hire her for

---

[7]"Costochrondritis" is defined as "[i]nflammation of one or more costal cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate."  Stedman's Medical Dictionary 450 (28th ed. 2006).

additional work after the store found out that she was disabled and undergoing treatment at Southlake.  She also testified that she could not focus on the job and sometimes overcharged customers.  The Plaintiff reported that she previously worked as a housekeeper and was told she was not doing the job correctly.  She stated that she could not do that job due to the stress and her inability to get along with co-workers.  She testified that she does not like authority, is stubborn, and cannot pay attention long enough to hold a cleaning job.

The Plaintiff testified that her condition worsened prior to the hearing and she had to go to therapy three times a week for a partial hospitalization program.  Additionally, she stated that she shattered her left knee playing basketball and skiing, resulting in bad arthritis, which caused her to limp in cold or rainy weather.  The Plaintiff testified that she has stomach problems and is unable to eat very much.

In response to questions from the ALJ about what she would do with her life now, the Plaintiff stated that she did not know.  The ALJ asked if she could get a GED and the Plaintiff responded that she failed the GED examination because she could not pass the math portion of the test.  The Plaintiff testified that she also suffers from a dual diagnosis of borderline personality disorder and sometimes hears voices that tell her to commit suicide and that she is worthless.  The Plaintiff stated that she is not able to deal with a lot of people and becomes argumentative.  She testified that others insult her and that she feels like the clinicians treating her and her supervisors at work always talk about her behind her back.  The Plaintiff stated that on occasion she cursed out supervisors at work and was sent home as a result.

The Plaintiff testified that she wants to work and likes to work but has problems and needs help to get better, which is why she gets treatment three times a week.  She indicated that she cried

a lot in front of customers at past jobs and that she still cries every day because "it feels like everything is going wrong." R. at 73. She reported that she has not slept well for three years and walks around at night. The Plaintiff stated that her appetite is gone and she has lost 47 pounds since an onset of diarrhea two weeks prior to the hearing. She testified that she feels like ending it all and does not take pleasure from anything.

### D.  Vocational Expert's Testimony

Glee Ann Kehr testified at the hearing as the VE. The ALJ posed a hypothetical to the VE of an individual who is restricted to light exertional duties, simple routine work, no more than superficial contact with supervisors, co-employees, and the general public. The VE testified that the hypothetical individual would be able to perform the Plaintiff's past work as a housekeeper but that other past work would be precluded. The ALJ then asked the VE if the hypothetical individual were unable to return to the housekeeping job whether there was other work available in the regional or national economy that such a person could do. The VE responded that other work is available to such an individual in the Chicago area such as work as a mail clerk (6,000 jobs), assembler (3,600 jobs), and sorter (4,000 jobs).

The ALJ then modified his hypothetical and added deficiencies in concentration caused by exacerbation of bi-polar personality symptoms or side effects from medication, such that the person would be unable to concentrate as much as fifteen minutes out of every hour. The VE responded that this condition would preclude all work. The ALJ then asked the VE whether an individual who was not limited to fifteen minutes of concentration, but instead missed one day of work a week could work in the regional or national economy. The VE responded that all jobs would again be precluded. The ALJ again modified the original hypothetical and asked the VE whether an

individual who could keep on task at work but had problems getting along with others and would periodically swear at the boss or co-workers to the extent that she caused a scene at least once a month could work in the regional or national economy.  The VE responded that all jobs would be eliminated for such an individual.  The ALJ modified the hypothetical individual once more and asked whether the individual could work if she had dehydration or elevated kidney problems causing her to miss work as often as three days a month.  The VE responded that the condition would preclude all work.

The Plaintiff's counsel then questioned the VE and asked whether an individual with a GAF score of 35 was capable of work.  The VE responded "generally not."  R. at 84.  The attorney then asked if an individual with a GAF score of 45 could work.  The VE responded that 45 is a little closer but that the person would still be "very, very limited, [and] probably would not be able to sustain the employment ultimately."  *Id*.

### E.  The ALJ's Decision

The ALJ concluded that the Plaintiff was not disabled within the meaning of the Social Security Act.  The ALJ found that the Plaintiff suffered from three severe impairments: kidney insufficiency, bi-polar disorder, and depression but that those impairments did not meet a Listed impairment in the social security regulations.  The ALJ found that the Plaintiff's allegations regarding disability were not totally credible.  The ALJ determined that the Plaintiff retained the functional capability to perform simple, routine, light work with no more than superficial contact with supervisors, co-employees, and the public.  The ALJ concluded that the Plaintiff could not perform her past relevant work but could perform a significant number of jobs in the regional economy, including work as a mail clerk (6,000 jobs), and sorter (4,000 jobs).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55

16

F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits."  *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Young v. Barnhart*, 362 F.3d 995, 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  *See* 42 U.S.C. § 423(d)(1)(A).  To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, the Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4).  The steps are:

(1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2.

(2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3.

(3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4.

(4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5.

(5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC").  "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000.  The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

**ANALYSIS**

The Plaintiff argues that the ALJ committed reversible error by (1) engaging in an incomplete mental impairment analysis, specifically: failing to properly evaluate whether the Plaintiff meets a mental impairment listing, failing to properly weigh the evidence regarding the Plaintiff's mental impairments, and failing to elicit the testimony of a medical expert ("ME"); (2) improperly rejecting the opinions of a treating physician; (3) reaching an erroneous RFC finding by failing to follow SSR 96-8p and incorporate all of the Plaintiff's limitations; (4) making an improper credibility finding that ignores SSR 96-7p and 20 C.F.R. § 404.1529; (5) reaching a step five determination that is not supported by substantial evidence; and (6) making an erroneous decision influenced by the ALJ's bias against awarding benefits to individuals under age 50.  The Commissioner argues that the ALJ's findings are supported by substantial evidence and that the ALJ complied with the relevant legal requirements.

**A.  Analysis of mental impairments**

The Plaintiff contends that the ALJ failed to properly evaluate whether she meets a mental impairment listing.  In support, the Plaintiff argues that she meets the requirements of impairment Listing 12.05(C), mental retardation.  The Plaintiff contends that the ALJ's failure amounts to harmful error and that he did not fulfill his duty to analyze evidence at step three of the five-step sequential analysis.  The Plaintiff also argues that the ALJ did not comply with the special technique that the regulations require be applied to analyze mental impairments.  Finally, the Plaintiff contends that the ALJ should have called upon the testimony of an ME at the hearing.  The Commissioner contends that substantial evidence supports the ALJ's findings with regard to the Plaintiff's mental

19

limitations and that the ALJ complied with the regulations that apply to analyzing mental impairments.

### 1. Mental impairment listings

The determination of whether a claimant suffers from a listed impairment comes at steps two and three of the ALJ's analysis.  Step two of the ALJ's analysis requires an examination of whether the claimant has an impairment or combination of impairments that are severe.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  A medically determinable impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  The determination of whether a claimant suffers from a severe condition that meets a listed impairment comes at step three of the sequential analysis.  At step three, the ALJ must determine whether the claimant's impairments meet an impairment listed in the appendix to the social security regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  An individual suffering from an impairment that meets the description of a listing or its equivalent is conclusively presumed to be disabled.  *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).  In order "[f]or a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  An impairment that manifests only some of the criteria will not qualify, no matter its severity.  *Id.*

Listing 12.05 describes mental retardation and provides, in part:

Mental retardation refers to significantly subaverage general intellectual functions with deficits in adaptive functions initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

      C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function"

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

      Here, the ALJ did not find that the Plaintiff's mental impairment met the mental retardation Listing. The ALJ did find that the Plaintiff had two other severe mental health impairments: depression and bi-polar disorder. The Plaintiff contends that the ALJ only analyzed whether she met one mental listing, Listing 12.04. Listing 12.04 describes affective disorders, which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. The ALJ's decision states, "[i]n evaluating mental impairments . . . [t]he first step in this process involved a determination as to whether the claimant has any medically determinable mental impairment identified in Section 12.00 of the Listing of Impairments." R. at 24. Section 12.00 is the umbrella section that covers all mental disorder listings. The ALJ proceeded to conduct a review of the Plaintiff's treatment records from her mental health treatment at Southlake. The ALJ continued his mental analysis and analyzed the severity of the Plaintiff's mental impairments pursuant to the evaluation criteria set forth in Listing 12.00. The ALJ concluded that "there is no evidence that the claimant's depression/bi-polar disorder and their impact on her functioning are of such severity that they render her completely unable to function outside of her home." R. at 25. The Court finds that the ALJ did not limit his analysis to Listing 12.04 because his analysis applies to all the section 12.00 mental disorders.

With regard to the Plaintiff's argument that she qualifies under Listing 12.05, the burden of proof is on the Plaintiff. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). The Plaintiff contends that qualifying for an impairment under Listing 12.05 is a two-step test set forth in section 12.05(C). First, the plaintiff states that she must show an IQ score between 60 and 70, and second, must show that she suffers from a physical or mental impairment imposing an additional and significant work-related limitation on her ability to function. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. The Plaintiff relies on *Maggard v. Apfel*, a case in which the court seemingly adopted the Plaintiff's proposed two-step test but reached a holding unrelated to the two-step analysis. *See* 167 F.3d 376, 380 (7th Cir. 1999). The *Maggard* court found that the claimant had to show an IQ between 60 and 70 and a physical or other mental impairment imposing a significant work-related limitation to qualify as disabled under Listing 12.05 but that he was unable to make the required showing because of an invalid IQ score. *See id*.

In his response, the Commissioner argues that qualification under Listing 12.05 requires a three-step showing. The Commissioner contends that in addition to the two steps asserted by the Plaintiff, a Listing 12.05 claimant must also show that she was properly considered mentally retarded, demonstrated by significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested before age 22. This proposed third requirement comes from the introductory sentence of Listing 12.05, referred to as the diagnostic description. Contending that the diagnostic description is a requirement of 12.05(C), the Commissioner refers to 12.00A, which states, "Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies *the diagnostic description in the introductory paragraph and any one of the four sets of criteria*, we will find that your impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App. 1

§ 12.00A (emphasis added).  The United States Court of Appeals for the Seventh Circuit agreed in a recent opinion that Listing 12.05 requires the claimant to establish the diagnostic description, explaining that "the regulations do require the administrative law judge to determine that the claimant's mental 'deficits' were manifested before the age of 22."  *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *see also Maresh v. Barnhart*, 431 F.3d 897, 899 (8th Cir. 2006) (in analyzing 12.05, the court held that "the requirements in the introductory paragraph are mandatory").  The Court finds that based on 12.00A and the recent Seventh Circuit opinion in *Mendez*, the Plaintiff must show the requirements of the diagnostic description contained within the opening sentence of Listing 12.05 to establish that she suffers from an impairment under Listing 12.05.[8]

To establish the first element of Listing 12.05(C), the Plaintiff points to a Wechsler Adult Intelligence Scale-Revised ("WAIS-R") test that she underwent on April 11, 2003.  The test resulted in three different IQ scores: a verbal IQ of 70, a performance IQ of 77, and a full-scale IQ of 71. "In cases where more than one IQ is derived from the test administered, i.e., where verbal, performance, and full-scale IQs are provided as on the WAIS, the lowest of these is used in conjunction with 12.05."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D).  The Plaintiff's lowest IQ measured in the WAIS-R exam was 70.  Thus, the Plaintiff meets the first requirement of Listing 12.05(C), albeit with the highest possible qualifying IQ.

To meet the second requirement, the Plaintiff must demonstrate some "physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  In his decision, the ALJ found that "[t]he medical evidence

---

[8]The Court notes that the Plaintiff acknowledges and addresses the diagnostic description in her reply brief.

establishes that the claimant has kidney insufficiency, bi-polar disorder, and depression.  These medically determinable impairments cause significant limitations in the claimant's work-related functioning and are, therefore, severe within the meaning of the Regulations." R. at 28.  As a result, the Plaintiff satisfies the second requirement by way of any one of her three severe conditions.

Pursuant to the third requirement, the Plaintiff must show that she was properly considered mentally retarded demonstrated by significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested before age 22.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  The earliest evidence in the record that the Plaintiff suffered from a mental impairment is the April 11, 2003, IQ test.  On that date, the Plaintiff was 37 years old.  In her application for SSI and DIB, the Plaintiff lists a disability onset date of January 7, 2003, also when she was 37 years old.

Also militating against finding that the Plaintiff established the third requirement of 12.05(C) are the notations of the Plaintiff's treating physicians and her testimony at the hearing.  The Plaintiff's physicians made comments with regard to her overall mental functioning, such as that her "intellect appears to be below average" and that she has "limited intellectual functioning," but did not comment on her adaptive behavior.  R. at 246, 257.  In addition, her treating physicians, Drs. Reynolds, Vas, Saboor, and Rao concluded that she suffered from "borderline" or "limited" intellectual functioning but never diagnosed mental retardation.  R. at 207, 257, 606.  At the hearing, the Plaintiff testified that she was able to engage in a number of adaptive activities, as defined by the regulations, such as shopping, cleaning, cooking, and paying bills.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(c)(1).

In her reply brief, the Plaintiff asserts a number of other arguments that she meets Listing 12.05, such as that a diagnosis of mental retardation is not necessary to meet the Listing and that her impairments should be analyzed in combination with her IQ to determine whether she meets the Listing. The Plaintiff's claims, while true, do not make the affirmative showing required by the diagnostic description. The Plaintiff also submits that her failure to graduate from high school is evidence that she displayed early deficits in her adaptive behavior. This claim is not evidence and it and other similar unsupported claims submitted by the Plaintiff do not persuade the Court. The Court notes that the Plaintiff testified at the hearing that it was negative influence from a bad crowd that prevented her graduation from high school, not her limited mental aptitude. The Plaintiff's combined arguments are unable to establish that she meets the diagnostic description. Without this showing, the Plaintiff's other arguments with regard to Listing 12.05(C) cannot prevail. The Court finds that the ALJ's decision that the Plaintiff did not suffer from a Listing 12.05 impairment is supported by substantial evidence.

### 2. *Evidence of mental impairments and the special technique*

The Plaintiff contends that the ALJ engaged in a deficient analysis of her mental impairments. An ALJ's analysis of mental impairments must comply with the "special technique" described in 20 C.F.R. § 404.1520a. Pursuant to federal regulations, the special technique to rate the degree of mental functioning is only intended to aid an adjudicator in assessing the level of severity of a claimant's mental impairment at steps two and three of the five-step sequential evaluation. 20 C.F.R. § 404.1520a(c)(3) (citing 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C)). Section 404.1520a requires the ALJ to first evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). Once the ALJ determines that the claimant has a

25

medically determinable mental impairment, the ALJ "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [such] findings in accordance with paragraph (e) of this section." *Id.*

Next, the ALJ "must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record [the] findings as set out in paragraph (e) of this section." *Id.* at § 404.1520a(b)(2).  In rating the degree of functional limitation, the ALJ must consider "all relevant and available clinical signs and laboratory findings, the effects of [the] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.* at § 404.1520a(c)(1).  The ALJ rates the degree of limitation based on the extent to which the impairment interferes with the ability to function independently, appropriately, effectively, and on a sustained basis.  The ALJ rates four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id.* at § 404.1520a(c)(3).  In the first three areas, the ALJ utilizes a five-point scale: none, mild, moderate, marked, and extreme, and in the fourth area, the ALJ uses a four-point scale: none, one or two, three, four or more.  *Id.*  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." *Id.*

After the ALJ rates the degree of functional limitation resulting from the impairment, the ALJ must determine the severity of the mental impairment.  *See id.* at § 404.1520a(d).  If the ALJ rates "the degree of [] limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work

activities . . ." *Id*. at § 404.1520a(d)(1).  If the mental impairment is found to be severe, further steps

are required.  *See id*. at § 404.1520a(d)(2)-(3).

At the ALJ hearing level, this technique is to be documented in the decision.  *See id*. at §

404.1520a(e).  More specifically:

> At the administrative law judge hearing and Appeals Council levels, the written
> decision issued by the administrative law judge or the Appeals Council must
> incorporate the pertinent findings and conclusions based on the technique.  The
> decision must show the significant history, including examination and laboratory
> findings, and the functional limitations that were considered in reaching a conclusion
> about the severity of the mental impairment(s).  The decision must include a specific
> finding as to the degree of limitation in each of the functional areas described in
> paragraph (c) of this section.

*Id*. at § 404.1520a(e)(2).

The level of detail required to satisfy the special technique is explored in *David v. Barnhart*.

*See* 446 F.Supp.2d 860 (N.D. Ill. 2006).  In *David*, the claimant argued that the ALJ failed to

properly apply the special technique to her assessment of the claimant's mental impairments because

the ALJ did not reference the technique in her decision and did not make specific findings for each

of the four criteria.  Rather than make specific findings for each of the four criteria, the ALJ

incorporated the findings of a psychiatric physician and a medical expert who rendered pertinent

findings based on the special technique criteria.  The court found that the ALJ's reliance on the

physicians' findings obviated the need for her to meticulously comply with the technique and render

her own independent findings.  *See id*. at 877.  The court concluded that because it was able to trace

the ALJ's reasoning in her analysis of the claimant's mental impairments, that the analysis complied

with the regulations.  *See id*.

Here, the ALJ engaged in an analysis of each of the four criteria listed in paragraph B of the Listings of Mental Impairments. In analyzing the criteria, the ALJ referred to examples of specific activities that the Plaintiff engaged in according to the record. Evaluating activities of daily living, the first criterion, the ALJ found that the Plaintiff was able to care for and groom herself, get her children ready for school, prepare breakfast, drop her youngest child off at school and pick her up in the evening, and perform various household chores. Based on these activities, the ALJ concluded that the Plaintiff's limitations in daily activities were moderate.

In analyzing the second criterion, social functioning, the ALJ found that the record established that the Plaintiff had the "ability to get along with others . . . , has a positive and supportive relationship with her aunt and sister-in-law . . . , [and] is able to go shopping at least once a month for groceries and personal items." R. at 25. The ALJ found that the Plaintiff suffered from moderate limitations in social functioning

With regard to concentration, persistence, or pace, the third criterion, the ALJ found that the evidence supported a finding that the Plaintiff could pay bills, count change, handle a savings account, use a checkbook and money order, and is able to follow verbal and written instructions well. The ALJ concluded that the Plaintiff suffered from moderate limitations in this area.

The ALJ provided the least analysis when considering the fourth criterion, episodes of decompenstaion. The ALJ concluded that the Plaintiff suffered from one repeated episode of decompensation but did not state what the repeated episode was or provide further explanation. Analyzing the four criteria in combination, the ALJ concluded that "there is no evidence that the claimant's depression/bi-polar disorder and their impact on her functioning are of such severity that they render her completely unable to function outside of her home." R. at 25. The ALJ determined

that the Plaintiff maintained the RFC "for performing the exertional and nonexertional requirements of work, except for that more exertionally demanding than simple, routine, light work.  Other limitations include no more than superficial contact with supervisor, co-employees and the general public."  R. at 29.

In his decision, the ALJ followed the special technique and discussed each of the four criteria individually.  The ALJ reached a conclusion with regard to each criterion, as the regulations require. Discussing each criterion, the ALJ set forth a list of activities that the Plaintiff could engage in. The ALJ concluded that the Plaintiff had moderate limitations in three of four criteria.  The ALJ did not list activities that the Plaintiff could not participate in but that level of analysis is not required to comply with the special technique.  The ALJ's detailed analysis of the four criteria and repeated references to facts contained in the record allow the Court to trace his reasoning as he measured the Plaintiff's mental limitations.  The ALJ's analysis here is more detailed and illustrative than the ALJ provided in *David*.  Here, the ALJ gave specific findings and complied with the detailed requirements of the regulations.  The Court therefore finds that the ALJ successfully complied with the special technique set forth in 20 C.F.R. § 404.1520a.

### 3.  Medical expert testimony

The Plaintiff contends that the ALJ should have called upon an ME to help evaluate her mental impairments.  The Commissioner argues that the decision to call an ME to testify at a hearing is generally within the ALJ's discretion, and because of the supporting medical evidence submitted in the record in this case, the ALJ did not require an ME's assistance.  An ALJ is legally required to seek additional information if the ALJ received inadequate evidence from the physicians or the

record as a whole to render a determination of disability.  *See* 20 C.F.R. § 404.1527(c)(3); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004).

The Plaintiff refers to several of the ALJ's remarks at the hearing to support her argument, such as when discussing a borderline personality disorder the, ALJ said "you look okay to me."  R. at 55.  The Plaintiff also points to the ALJ's statement that affective disorders, such as depression and bi-polar disorder, are "generally controllable with talk therapy and medication."  R. at 59.  The Plaintiff contends that these statements and others in the same vein demonstrate that the ALJ did not have a clear understanding of mental impairments.  However, the medical record contained the opinions of two state agency physicians and four treating physicians, all of whom provided opinions and information regarding the Plaintiff's mental abilities and limitations.  In addition, after the hearing, the Plaintiff submitted additional treatment records for the ALJ to review.  Based on the degree to which the record is developed, the Court finds that it was sufficient, combined with the ALJ's knowledge and experience, to form a base of knowledge for the ALJ to consider the Plaintiff's potential impairments.  The Court concludes that the ALJ was not legally required to call an ME to testify at the hearing.

### B.  Findings of treating physicians

The Plaintiff also contends that the ALJ improperly rejected a portion of treating physician Dr. Rao's opinion after giving weight to other portions of Dr. Rao's findings.  The Commissioner responds by stating that the ALJ's reliance on Dr. Rao's findings was justified.

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.152(d)(2); *Boiles*, 395 F.3d at 426 (quoting *Clifford*, 227 F.3d at 870).  "More weight is given

30

to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel*, 345 F.3d at 470 (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2)).

An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ is able to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 871). An ALJ can reject a treating physician's opinion only for reasons supported by the record, the opinion of a non-treating physician alone is not enough. *Gudgel*, 345 F.3d at 470 (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). Remand may be appropriate if the ALJ failed to give an adequate explanation of why the treating physician opinion was not entitled to controlling weight. *See Clifford*, 227 F.3d at 871; *Liscano v. Apfel*, 230 F. Supp. 2d 871, 887-88 (N.D. Ind. 2002).

Dr. Rao, a Southlake psychiatrist who treated the Plaintiff repeatedly, opined on April 6, 2004, that the Plaintiff had a fair ability, defined as "[a]bility to function in this area is limited but satisfactory," to: follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisor(s); maintain attention/concentration; understand and remember and carry out complex, detailed, or simple job instructions; and maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations. R. at 605. Dr. Rao found that the Plaintiff had poor to no ability, defined as "[n]o useful ability to function in this area," to: deal with work stresses or function independently. *Id.*

In his decision, the ALJ gave consideration to "the reports of the state agency medical consultants as well as to other treating, examining, and non-examining medical sources." R. at 27. The ALJ accorded some weight to Dr. Rao's opinions regarding the Plaintiff's fair abilities in certain areas. The ALJ found that these conclusions were supported by substantial medical evidence in the record. However, when it came to Dr. Rao's opinions that "the claimant would have poor or no ability to deal with work stresses or function independently," the ALJ did not accord significant weight to her opinions. *Id.* The ALJ supported his reduced reliance with two justifications: (1) the Plaintiff's reports to physicians and testimony at the hearing that she was able to complete household activities; and (2) what the ALJ found to be an internal inconsistency in Dr. Rao's reports.

With regard to the Plaintiff's reports and testimony that she was able to complete household chores and make babysitting arrangements for her children, those statements may be relevant to the Plaintiff's ability to function independently but they have little or no bearing on her ability to handle work stresses. The Plaintiff's testimony provides a basis for the ALJ's conclusion that Dr. Rao's finding that the Plaintiff was unable to function independently was inconsistent with the Plaintiff's statements. However, the Plaintiff did not testify that she had full capacity to complete household activities or function independently. Thus, the Plaintiff's testimony was not inconsistent with Dr. Rao's finding that the Plaintiff retained little ability to function independently because completing typical household activities to the extent the Plaintiff testified she was able does not contradict a finding that the Plaintiff was limited in this area. In addition, completing typical household activities is not indicative that an individual is able to handle work stresses, such as interacting with co-workers or customers. As a result, the testimony does not support the ALJ's conclusion that the Plaintiff's statements were inconsistent with Dr. Rao's finding that the plaintiff had poor ability to handle work stresses.

The ALJ's second justification for his reduced reliance on Dr. Rao's findings is also unsupported. The ALJ concluded that Dr. Rao's opinions were internally inconsistent. The ALJ referenced one report in the record as an example of an inconsistency; however, the referenced report, dated October 7, 2004, is signed by Natalie Hargrove, a group therapy clinician. Dr. Rao's name does not appear on the report. The ALJ described the Hargrove report as reflecting that the Plaintiff was able to function independently and handle stresses related to dealing with her household and issues such as babysitting. The report actually discusses the fact that the Plaintiff cannot afford a babysitter and was no longer able to attend therapy sessions as frequently as she could before. The October 7, 2004, report closes by noting that the Plaintiff "continues to be withdrawn and reluctant to give others feedback, possibly due to low self-confidence, but she utilizes groups effectively to work on her own issues. She received education on techniques for changing automatic thoughts; she was receptive." R. at 433. While the report contains glimmers of hope, it generally reflects that the Plaintiff continued to struggle with several personal issues. The report did not establish that the Plaintiff could function independently or handle stress as the ALJ interpreted it to.

The ALJ provided no further explanation for his refusal to rely on Dr. Rao's findings. The Court concludes that the ALJ's reference to a report completed by another treating physician, which is actually consistent with Dr. Rao's findings, is not a valid reason to disregard the findings of Dr. Rao. Nor does the Plaintiff's testimony that she is able to complete household chores cast doubt on Dr. Rao's finding that she had little to no ability to handle work stresses. Finding that the ALJ's failure to rely on a treating physician's opinion is not sufficiently supported, the Court remands this matter for proper consideration of the opinions of the Plaintiff's treating physicians.

33

**C.  SSR 96-8p**

Next, the Plaintiff contends that the ALJ made an erroneous RFC finding because he did not follow SSR 96-8p and failed to incorporate all of the Plaintiff's limitations.  The Plaintiff's argument focuses on the ALJ's alleged failure to consider many of the Plaintiff's physical ailments.  In an earlier section of her brief, the Plaintiff also argued that the ALJ failed to incorporate the Plaintiff's mental limitations into his RFC finding.  The Court will consider both arguments in this section. The Commissioner contends that the ALJ appropriately followed the requirements of SSR 96-8p.

"Residual functional capacity" is a measure of what an individual can do despite the limitations imposed by his impairments.  *See* 20 C.F.R. § 404.1545(a).  The determination of a claimant's RFC is a legal decision rather than a medical one.  *See* 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n.2.  The RFC is an issue at steps four and five of the sequential evaluation process. *See* SSR 96-8p.  "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  *Id*.

Social Security Ruling 96-8p states:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe".  While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may-when considered with limitations or restrictions due to other impairments-be critical to the outcome of a claim. . . .

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 4 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any

material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* The Rulings also state that medical conditions that are not severe, when combined, can produce a severe impairment. *See* SSR 85-28.

An example of an incomplete RFC is seen in *Young v. Barnhart*. *See* 362 F.3d at 1002. In *Young*, the record contained opinions of treating physicians that the claimant suffered from temper problems, poor social judgment, a severe adjustment disorder marked by blunted insight and judgment, decreased mood and functioning, and an increased tendency to become irritable. In his decision, the ALJ concluded that the claimant had the RFC to "perform the nonexertional requirements of simple, routine, repetitive, low stress work with simple contact with co-workers and the public. There were no exertional limitations." *Id.* The court found that the ALJ's RFC finding was underdeveloped and the court was unable to conclude that the ALJ considered the claimant's personality disorders documented in the record. *See id.* As a result, the Court found the RFC to be incomplete. *See id.*

Here, the ALJ concluded that the Plaintiff suffered from three severe conditions: kidney insufficiency, bi-polar disorder, and depression. The ALJ also noted that the Plaintiff suffered from the following physical impairments, which he found were not severe: tubal pregnancies, abnormal menstrual bleeding, extended periods of diarrhea with vomiting and nausea, constipation, elevated BUN and creatinine levels, anemia, renal failure, urinary tract infection, elevated liver tests, elevated bilirubin, hyperglycemia, kidney calyces, asthma, and hypertension. Ultimately, the ALJ found that the Plaintiff:

retains the [physical] residual functional capacity for performing the exertional and nonexertional requirements of work, except for that more exertionally demanding

> than simple, routine, light work. . . .  Motor strength was 5 out of 5 in all extremities.
> Her fine and gross manipulations were normal.  There was no anatomic deformity
> of the lower extremities, nor any cynosis or edema.  Her station was stable and she
> was able to walk with a normal gait without an assistive device (Exhibit 7F).

R. at 26.  The Plaintiff argues that the ALJ's RFC finding ignored numerous other physical impairments, such as: left hip pain, tendinitis of the left shoulder, gastritis, hypertension, urinary frequency, kidney dysfunction, gout with swollen legs, edema, pain in both feet, left knee pain, instability, reflux esophagitis, anemia, hiatal hernia, borderline cardiomegaly, gallstones, hypokalemia, and pancreatitis with chronic renal insufficiency.

Reviewing the ALJ's decision, the Court finds that the ALJ complied with SSR 96-8p and considered the Plaintiff's physical limitations, both severe and not severe, in making his RFC finding.  The ALJ considered numerous physical impairments suffered by the Plaintiff and considered the reports of treating, consulting, and reviewing physicians in his decision.  The ALJ's failure to address some of the conditions that the Plaintiff alleges she suffered from can be attributed to the ALJ's finding that the Plaintiff was not totally credible and differences between the diagnoses and findings of the Plaintiff's physicians.  The ALJ's conclusion with regard to the Plaintiff's credibility is analyzed in depth, *supra*.  The Court finds that in reaching his RFC finding, the ALJ gave due consideration to the Plaintiff's limitations and, when his decision is read in its entirety, the ALJ's findings are supported by substantial evidence in the record.

The Plaintiff also argues that the ALJ failed to adequately consider her mental limitations in his analysis.  Specifically, the Plaintiff asserts that the ALJ did not consider her intellectual impairment.  While the Court found in Section A of this Opinion that the Plaintiff is unable to show that she qualifies as mentally retarded under Listing 12.05, the Plaintiff correctly points out that because the ALJ found that she suffers from three severe impairments, he was required to consider

those impairments in conjunction with the entire constellation of ailments presented by the Plaintiff. *See* SSR 96-8p.

The ALJ's consideration in the mental RFC is limited to the Plaintiff's depression and bi-polar disorder. There is no indication that the ALJ contemplated the Plaintiff's intellectual function, which due to her documented borderline IQ score of 70 and diagnoses of suffering from "limited" or "borderline" intellectual functioning by treating physicians, warranted consideration in combination with her other limitations. *See* R. at 207, 257, 606. Just as the ALJ in *Young* did not mention the claimant's personality disorders, here the ALJ failed to mention the Plaintiff's borderline intellectual functioning. Because the Plaintiff's borderline intellectual functioning is a documented clinical evaluation that is potentially relevant to her mental limitations, the Court finds that the ALJ was required to consider it in combination with her other impairments when analyzing her mental RFC. On remand, the ALJ must consider the limitations and restrictions imposed by all of the Plaintiff's impairments of record, even those that are not severe.

### D. Credibility finding

The Plaintiff also seeks remand on the basis that the ALJ made an improper credibility finding that ignored SSR 96-7p and C.F.R. § 404.1529 when he found that the Plaintiff's allegations regarding her limitations were "not totally credible." R. at 29. The Commissioner states that the ALJ properly assessed the Plaintiff's credibility.

The Social Security Regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statement about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability.

*See id*.  The Regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms.  20 C.F.R. § 404.1529(a).

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;

(2)     Location, duration, frequency, and intensity of pain or other symptoms;

(3)     Precipitating and aggravating factors;

(4)     Type, dosage, effectiveness, and side effects of any medication;

(5)     Treatment, other than medication, for relief of pain or other symptoms;

(6)     Other measures taken to relieve pain or other symptoms;

(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  In making a credibility determination, Social Security Ruling 96-7p states that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statement about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence.  *See* SSR 96-7p.

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he or she is unable to work.  *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely

because they are not substantiated by objective evidence." SSR 96-7p at *6. An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

In his decision, the ALJ explained that he found that the Plaintiff was not totally credible because: (1) her medications were generally successful in controlling her symptoms; (2) her daily activities were not limited to the extent that the ALJ would expect of a disabled individual making the complaints that the Plaintiff did; and (3) her ability to engage in daily activities such as caring for her children and completing housework contradict her assertion that she is unable to handle stress. The ALJ's first conclusion regarding the effectiveness of the Plaintiff's medication finds support in the record from a statement made by the Plaintiff to Dr. Saboor on October 1, 2003, when she stated that she felt the prescribed Trazodone medication was helping her. In addition, the record does not reveal that the Plaintiff made any complaints to her physicians that her medications were ineffective or causing problematic side effects. The Plaintiff did often cry when meeting with her physicians and consistently complained of depression and anger issues but never complained about her medications. The lone statement in the record that the Plaintiff found her medication to be helpful provides a modicum of support for the ALJ's conclusion.

The ALJ also relied on the Plaintiff's testimony that she was able to care for her own personal care and grooming, help her children get ready for school, prepare breakfast, drop her youngest child off at school and pick her up in the evening, and perform various household chores such as laundry and housework. The ALJ acknowledged that the Plaintiff "undoubtedly may experience some pain, limitations, and restrictions from her impairments," however he found that "the extent and frequency reported is not fully credible or supported by the objective medical

evidence of record." R. at 27. The ALJ found that the level of impairment reported by the Plaintiff was not consistent with her abilities to engage in daily activities. The Court finds that the ALJ's credibility determination is supported by the Plaintiff's testimony at the hearing and medical reports in the record. The Court lends substantial deference to the ALJ's determination, which the ALJ reached after witnessing the Plaintiff's testimony and eliciting portions of the testimony himself. Noting the high regard given to the ALJ's credibility finding, the Court concludes that the ALJ's determination is not patently wrong.

## E. Step five

With regard to step five of the sequential analysis and particularly the ALJ's finding that the Plaintiff can perform a significant number of jobs in the economy, the Plaintiff suggests that the ALJ's determination is not supported by substantial evidence because the ALJ did not provide an accurate hypothetical to the VE. The Plaintiff also contends that the ALJ did not comply with the requirement of SSR 00-4p to ensure that the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). The Commissioner contends that the ALJ's step five finding that the Plaintiff can perform a significant number of jobs in the national economy is supported by substantial evidence.

### 1. VE hypothetical

A hypothetical question to a VE must include all limitations supported by medical evidence in the record. *See Young*, 362 F.3d at 1003 (citing *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)). The VE should understand the full extent of the claimant's disability so he or she does not declare the claimant able to perform work in the national or local economy that the claimant cannot truly perform. *See id.* The hypothetical does not have to include every physical limitation, provided

that the VE had the opportunity to learn of the claimant's limitations independently. *See id*. The VE's independent review of the medical record is sufficient to inform the VE of the claimant's disabilities. *See id*. If the hypothetical does not include every condition suffered by the claimant, there must be evidence in the record indicating that the VE knew the extent of the claimant's limitations. *See id*.

Analyzing the ALJ's step five analysis and conclusion, the Court again relies on the Seventh Circuit's decision in *Young*. As previously noted, the court in *Young* found that the ALJ's RFC did not meet the requirements of the regulations because it failed to account for evidence in the record that the claimant had certain behavioral problems. *See* 362 F.3d at 1002-03. The ALJ in *Young* questioned a VE at the claimant's hearing. The ALJ posed a hypothetical to the VE that was based on his RFC finding. The Court held that "[b]ecause the administrative judge used his RFC as the basis for his hypothetical question to the vocational expert, his hypothetical question also failed to include all the necessary information." *Id*. at 1003. The Court reasoned that generally, a hypothetical must include all limitations supported by medical evidence in the record, and because the ALJ's RFC was deficient and failed to mention several limitations, his hypothetical, based on that RFC, was also deficient for failing to mention the same limitations. *See id*.

The Court finds that the instant case is analogous to *Young*. Here, the ALJ initially posed the following hypothetical to the VE:

> Suppose we have a hypothetical individual limited basically to light exertional duties, simple routine work, no more than superficial contact with supervisors, co-employees, and the general public. Would that hypothetical individual be able to return to any of the past relevant work of the claimant?

R. at 82.  In response to the hypothetical, the VE testified that such an individual would not be precluded from returning to past work as a housekeeper and could work at jobs found in a significant number in the regional economy such as mail clerk and assembler.  The Court notes the similarity of the initial hypothetical and the ALJ's RFC finding:

> The evidence of record as a whole supports a finding that the claimant retains the residual functional capacity for performing the exertional and nonexertional requirements of work, except for that more exertionally demanding than simple, routine, light work.  Other limitations include no more than superficial contact with supervisors, co-employees and the general public.

R. at 29.  The ALJ went on to pose four additional hypothetical questions to the VE, describing the following individuals: (1) the same individual but with deficiencies in concentration caused by exacerbation of bi-polar personality symptoms or side effects from medication who is unable to concentrate as much as fifteen minutes per hour; (2) the same individual who is able to concentrate at all times but because of periodic exacerbation of symptoms would miss at least one day of work a week; (3) an individual who can keep on task but because of problems with other people at work, would cause a scene at least once a month and would swear at a boss or coworker; (4) an individual who underwent periodic bouts of dehydration or elevated kidney problems, which caused the person to be hospitalized as often as three days each month.  In response to each hypothetical, the VE stated that the impairments described by the ALJ would preclude all work.

Next, the Plaintiff's attorney questioned the VE and asked whether a person with a GAF of 35 would be capable of engaging in substantial gainful activity.  The VE responded, "[g]enerally not."  R. at 84.  When asked if an individual with a GAF of 45 could engage in substantial gainful activity, the VE answered, "[f]orty-five is a little closer, but still would be very, very limited, probably would not be able to sustain the employment ultimately."  *Id.*

42

The Court finds that here, as in *Young*, the hypothetical that the ALJ ultimately relied on was incomplete.  Upon inspection, the first hypothetical and the RFC are nearly identical.  Whether the ALJ based his hypothetical on the incomplete RFC findings, or based his RFC findings on the incomplete hypothetical, is immaterial.  The Court finds that both the hypothetical and the RFC finding are incomplete because they fail to mention the Plaintiff's documented intellectual limitation.

The Court also finds that the first hypothetical does not describe any of the Plaintiff's specific impairments.  The ALJ had the opportunity to form his opinion based on the VE's response to any of six hypothetical questions.  Five of the hypotheticals described specific limitations that are shown in the record to be impairments encountered by the Plaintiff.  The remaining hypothetical presented a general description and did not describe any of the specific limitations that the Plaintiff suffered from.  The ALJ chose to base his RFC on the general hypothetical, which also happened to be the only hypothetical that the VE found would allow for substantial gainful activity.  The ALJ failed to explain his choice to use the factually incomplete hypothetical as the basis for his conclusions.  The Court notes that the VE did not testify that she independently reviewed the record and the Court is therefore unable to infer that the VE had knowledge of all the Plaintiff's limitations.  On remand, the ALJ must offer a hypothetical that includes all limitations supported by the medical evidence of record.

### 2.  SSR 00-4p

SSR 00-4p requires an ALJ who takes testimony from a VE about the requirements of a particular job to determine whether that testimony is consistent with the Dictionary of Occupational Titles ("DOT").  More specifically, SSR 00-4p provides:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT.  In these situations, the adjudicator will:

> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4.  In *Prochaska v. Barnhart*, the ALJ heard testimony from a VE as to the plaintiff's limitations but did not ask whether the VE's analysis conflicted with the DOT.  *See* 454 F.3d at 731.  The Seventh Circuit concluded that the plaintiff "was not required to raise this issue at the hearing, because [SSR 00-4p] places the burden of making the necessary inquiry on the ALJ."  *Id.* at 735.  In other words, the ALJ bears the burden to inquire as to any possible conflicts between the VE's testimony and the DOT.  In *Lembke v. Barnhart*, the court found that "[h]earing the VE's affirmative response [that his testimony was consistent with the DOT], the ALJ had no obligation under SSR 00-4p to inquire further."  No. 06-C-0306-C, 2006 WL 3834104, at *15 (W.D. Wis. Dec. 29, 2006).

Here, the ALJ inquired at the May 17, 2005, hearing as to whether the VE's testimony would be consistent with the DOT.  At the outset of questioning, the ALJ asked:

> Ms. Kehr, you're going to testify in accordance with the information contained in the Dictionary of Occupational Titles, Selected Characteristics of Occupations.  If there is a difference between your testimony and the information of those sources, you're going to let us know, correct?

> VE: Yes.

R. at 81.  In the Court's view, the ALJ's question does not satisfy the requirement spelled out in SSR 00-4p and clarified in *Prochaska* that an ALJ must ask a VE if the evidence he or she provided conflicts with information provided in the DOT.  SSR 00-4p requires "a reasonable explanation" as to an apparent conflict "[i]f the VE's or VS's evidence appears to conflict with the DOT. . ."  SSR 00-4p, 2000 WL 1898704, at *4.  The requirement is not an onerous one, it only asks for a simple verification.  However, questioning a VE as to the consistency of her testimony before she testifies is problematic.  Prior to the testimony, the VE has not heard the hypothetical(s) that will be posed and has not been questioned by the Plaintiff or Plaintiff's counsel.  Thus, at that point she is uncertain what her testimony will be.  The regulation states that the ALJ is to "[a]sk the VE . . . if the evidence he or she has provided conflicts with . . . the DOT."  SSR 00-4p, 2000 WL 1898704, at *4.  The language of the regulation requires the ALJ to question the VE about the consistency of her testimony with the DOT after she gives her substantive testimony.  This approach is a more effective method of confirming that a VE's testimony is consistent with DOT.  On remand, the ALJ should question the VE as to the consistency of her testimony with the DOT after the VE testifies.

### F.  Bias

The Plaintiff's final argument is that the ALJ's decision is erroneous because it was influenced by the ALJ's bias against awarding benefits to claimants who are younger than 50 years old.  The Commissioner rejects this argument and contends that it lacks merit.

A fair trial before a fair tribunal is a basic requirement of due process and it applies to administrative agencies as well as courts.  *See Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975).  "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'"  *Id*. (quoting *In re Murchison*, 349 U.S.

133, 136 (1955)).  Evaluating allegations of bias, a reviewing court begins with the presumption that

the ALJ is unbiased.  *See Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007).  "It is only after a

petitioner has demonstrated that the decisionmaker 'displayed deep-seated and unequivocal

antagonism that would render a fair judgment impossible' that the presumption is rebutted, the

findings set aside, and the matter remanded for a new hearing."  *Id*. (quoting *Liteky v. U.S.*, 510 U.S.

540, 556 (1994)).

      In support of her argument that the ALJ is biased against younger claimants, the Plaintiff

cites a portion of the colloquy that occurred at the hearing.  Addressing the Plaintiff, the ALJ stated:

> It's my duty to do the right thing for you as well as do the right thing for the system.
> You're a young individual, you know.  Young individuals, if we can help them over
> the hump, if they've got a problem, they run into some snags and if we can help them
> over the hump, I'm all for that.  If they're going somewhere and we're going to get
> them back on their feet and they're going to get on with their lives in a productive
> and realistic way.  If they get stuck and they're going to be stuck and they're
> convinced they're going to be stuck, why should I give them disability.  They're just
> going to be stuck.  It's not going to help them at all. . . .  Now with your particular
> situation where - - you know, and I don't know what the problems are.  You know,
> you've got some borderline.  Your IQs aren't super, but you're not retarded either,
> you know.  Your personality isn't, you know, bubbly and outgoing and everything,
> but you're not surly or you know, you're not reactive to people. . .  But, you can do
> things when you're motivated to do things.  Right now you're not particularly
> motivated. . . .  So, I'm in a little bit of a bind as to what - - where you're going with
> your life and what the best thing is for you and how it fits into my - - our - - not me,
> but my particular duties in our particular system.  I don't understand why you can't
> do a simple job like cleaning up an office.  I don't see anything that - - in these - -
> any of the mental status exams."

R. at 60-62.  The Plaintiff also attached portions of other judicial opinions that she contends

reviewed and remanded decisions made by the same ALJ and mention his treatment of "younger"

claimants.  However, the attachments have no verifying indication that the ALJ discussed in the

transcripts is in fact the same ALJ who decided the instant matter.  In addition, the attached

documents are not part of the administrative record before the Court on review and the Court will

therefore not consider them as evidence.  Additional exhibits that the Plaintiff referred to in her brief to support her claim of bias were not attached to the brief at all and will also not be considered.

Here, the ALJ plainly discussed the Plaintiff's age at the hearing and what impact her age had on her ability to overcome her impairments and be productive.  The regulations provide that a claimant's age is within the purview of the ALJ's analysis, specifically stating that "[a]t the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  Other than pointing to the ALJ's remarks, which from all indications appear to be an attempt to motivate the Plaintiff and do not establish that the ALJ harbored a bias against her, the Plaintiff is unable to provide evidence to rebut the strong presumption of the ALJ's neutrality. The ALJ did conclude that the Plaintiff was not disabled and therefore not entitled to any benefits but the ALJ legitimized his decision on grounds wholly unrelated to the Plaintiff's age.  Therefore, the Court finds that the Plaintiff is unable to show that the ALJ acted with bias against her.

## CONCLUSION

The Court finds that the ALJ failed to provide a sufficient explanation for disregarding the opinions of a treating physician, failed to account for all of the Plaintiff's limitations in his RFC finding, failed to submit a complete hypothetical to the VE, and failed to properly question the VE as to the consistency of her testimony with the DOT.  Therefore, to this extent the Court **GRANTS** the Plaintiff's Opening Social Security Memorandum [DE 15] and **REMANDS** this matter for further proceedings consistent with this opinion.

SO ORDERED this 27th day of August, 2007.

s/ Paul R. Cherry

MAGISTRATE JUDGE PAUL R. CHERRY

UNITED STATES DISTRICT COURT

cc:     All counsel of record